UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: APPLICATION OF<br>SCLIQUOR, LLC,<br><br>               Applicant,<br><br><br>For An Order Pursuant To 28 U.S.C.<br>§ 1782 To Conduct Discovery For Use<br>In A Foreign Proceeding. | Case No. _23_ Misc. _00003_ |

**MEMORANDUM OF LAW IN SUPPORT OF SCLIQUOR, LLC'S**
**APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782**

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

STATEMENT OF FACTS ........................................................................................2

I.  SC and Empire Enter Into a Joint Venture to Sell D'Usse-Branded Cognac. ...................2

II.  After SC Exercises Its Put Option, Bacardi Procures a Breach of D'Usse's Operating Agreement by Manipulating Valuation Negotiations. ....................................3

III.  SC Seeks Discovery in Aid of Reasonably Contemplated Foreign Litigation Against Bacardi. .........................................................................................7

LEGAL STANDARD ...............................................................................................8

ARGUMENT .......................................................................................................10

I.  SC's Application Satisfies the Statutory Requirements for Granting Discovery Pursuant to 28 U.S.C. § 1782. ..................................................................11

    A.  SC seeks discovery from parties "resid[ing]" or "found" in this district. ............11

    B.  The discovery sought is "for use" in a "reasonably contemplated" proceeding in Bermuda. ........................................................................12

    C.  SC is an "interested person." ...............................................................15

II.  The Discretionary Factors Weigh in Favor of SC's Application. ..................................16

    A.  The discovery targets will not be participants in the Bermuda Action. ...............16

    B.  Bermuda is receptive to foreign evidence. ..............................................17

    C.  SC is not attempting to circumvent Bermudian proof-gathering restrictions. ........................................................................................19

    D.  The discovery sought is not unduly intrusive or burdensome. ..........................20

CONCLUSION .....................................................................................................21

# TABLE OF AUTHORITIES

Page

**Cases**

*In re Accent Delight Int'l Ltd.*,
    869 F.3d 121 (2d Cir. 2017) ............................................................................... 12

*In re Bank of Cyprus Pub. Co. Ltd.*,
    No. 10 Misc. 23, 2011 WL 223168 (S.D.N.Y. Jan. 21, 2011) ............................. 10

*In re Bayer AG*,
    146 F.3d 188 (3d Cir. 1998) ........................................................................ 8, 9, 16

*In re Bracha Found.*,
    663 F. App'x 755 (11th Cir. 2016) ..................................................................... 15

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
    673 F.3d 76 (2d Cir. 2012) ............................................................................. 9, 12

*In re Catalyst Managerial Servs., DMCC*,
    680 F. App'x 37 (2d Cir. 2017) ........................................................................... 16

*In re Chevron Corp.*,
    No. 11 Civ. 24599, 2012 WL 3636925 (S.D. Fla. June 12, 2012) ....................... 18

*Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*,
    747 F.3d 1262 (11th Cir. 2014) ........................................................................... 12

*In re Del Valle Ruiz*,
    342 F. Supp. 3d 448 (S.D.N.Y. 2018), *aff'd*, 939 F.3d 520 (2d Cir. 2019) ....... 8, 10

*In re Edelman*,
    295 F.3d 171 (2d Cir. 2002) ........................................................................... 9, 10

*In re England/Bahamas*,
    No. 20 Misc. 61696, 2021 WL 3270074 (S.D. Fla. July 30, 2021) ..................... 12

*Euromepa S.A. v. R. Esmerian, Inc.*,
    51 F.3d 1095 (2d Cir. 1995) ............................................................................... 16

*In re Gianoli Aldunate*,
    3 F.3d 54 (2d Cir. 1993) ....................................................................................... 9

*In re Gorsoan Ltd.*,
    No. 13 Misc. 397, 2014 WL 7232262 (S.D.N.Y. Dec. 10, 2014), *aff'd sub nom*, *Gorsoan Ltd. v. Bullock*, 652 F. App'x 7 (2d Cir. 2016) ............................. 17

ii

**TABLE OF AUTHORITIES**
**(continued)**

Page

*In re Grupo Qumma, S.A. de C.V.*,
  No. 05 Misc. 85, 2005 WL 937486 (S.D.N.Y. Apr. 22, 2005) ............................................17

*In re Hansainvest Hanseatische Investment-GmbH*,
  364 F. Supp. 3d 243 (S.D.N.Y. 2018) ..................................................................................11

*In re Hiscox Servs., Ltd.*,
  18 Misc. 00226, Dkt. No. 10 (S.D.N.Y. June 6, 2018) .........................................................17

*In re Hornbeam Corp.*,
  722 F. App'x 7 (2d Cir. 2018) ...............................................................................................11

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  542 U.S. 241 (2004) ......................................................................................................*passim*

*In re Kreke Immobilien KG*,
  No. 13 Misc. 110, 2013 WL 5966916 (S.D.N.Y. Nov. 8, 2013) ...........................................16

*In re Mariani*,
  No. 20 Misc. 152, 2020 WL 1887855 (S.D.N.Y. Apr. 16, 2020) .........................................10

*Mees v. Buiter*,
  793 F.3d 291 (2d Cir. 2015) ......................................................................................... 12, 19

*Minatec Fin. S.A.R.L. v. SI Grp., Inc.*,
  No. 08 Civ. 269, 2008 WL 3884374 (N.D.N.Y. Aug. 18, 2008) ..........................................18

*In re Operacion y Supervision de Hoteles, S.A. de C.V.*,
  No. 14 Misc. 82, 2015 WL 82007 (S.D.N.Y. Jan. 6, 2015) .................................................10

*In re Sarrio S.A.*,
  173 F.R.D. 190 (S.D. Tex. 1995) .............................................................................................9

*SIGA Techs., Inc. v. PharmAthene, Inc.*,
  132 A.3d 1108 (Del. 2015) ....................................................................................................14

*In re Top Matrix Holdings Ltd.*,
  No. 18 Misc. 465, 2020 WL 248716 (S.D.N.Y. Jan. 16, 2020) ...........................................11

*In re Tovmasyan*,
  557 F. Supp. 3d 348 (D.P.R. 2021) .......................................................................................18

*In re Wilhelm*,
  470 F. Supp. 2d 409 (S.D.N.Y. 2007) ...................................................................................11

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Young v. Chemical Bank, N.A.,*
 No. 87 Civ. 8601, 1988 WL 130929 (S.D.N.Y. Dec. 1, 1988).............................................17

*In re Zouzar Bouka,*
 No. 22 Misc. 92, 2022 WL 15527657 (S.D.N.Y. Oct. 28, 2022) .................................. 12, 15

**Statutes**

28 U.S.C. § 1782...............................................................................................................*passim*

**Other Authorities**

Hans Smit, *American Assistance to Litigation in Foreign and International*
 *Tribunals*, 25 Syracuse J. Int'l L. & Com. 1, 9 (1998)...........................................................8

## INTRODUCTION

This application for discovery in aid of a foreign proceeding relates to a dispute between Bacardi, one of the world's largest spirits companies, and SCLiquor, LLC ("SC"), a company majority-owned by the world-renowned musical artist and entrepreneur Shawn Carter—better known as Jay-Z.  In 2012, SC and a Bacardi subsidiary contractually agreed to become partners and equal owners of D'Usse LLC ("D'Usse" or the "Company"), a joint venture created to produce, market, and sell a premium Cognac brand that experienced remarkable immediate success.  In late 2021, SC exercised a contractual put option compelling Bacardi's United States-based subsidiary to buy out SC's 50% interest in the joint venture.  But, rather than negotiate in good faith and exercise commercially reasonable efforts, as mandated by the D'Usse Operating Agreement, to agree on a mutually acceptable fair price for the purchase of SC's interest in D'Usse, Bermuda-based Bacardi caused its United States-based subsidiary to breach its contractual obligations to SC by seeking to force SC to sell its interests for far less than the $2.5 billion dollars it is worth.

Based on those events, SC is now preparing to bring litigation against Bacardi in Bermuda, where Bacardi is incorporated and headquartered (the "Bermuda Action"), for procuring a breach of D'Usse's Operating Agreement under Bermudian law.  In aid of that contemplated case, SC seeks this Court's assistance to obtain relevant evidence from certain investors in Bacardi and/or its affiliates that are found within this Court's jurisdiction.  SC therefore respectfully requests that this Court approve the application and permit service of the proposed subpoenas seeking documents to aid its anticipated Bermuda Action.

## STATEMENT OF FACTS

**I.     SC and Empire Enter Into a Joint Venture to Sell D'Usse-Branded Cognac.**

D'Usse is a Delaware limited liability company that was created in 2012 by SC and Empire Investments, Inc. ("Empire") to manufacture, produce, market, sell and distribute a new brand of premium Cognac.  Perez Decl. ¶ 4.  SC is majority owned and controlled by Shawn Carter, better known as the world-renowned musical artist and entrepreneur Jay-Z.  *Id.* ¶ 5.  Empire is wholly owned and controlled, directly or indirectly, by Bacardi International Limited ("Bacardi International") and Bacardi International's parent company, Bacardi Limited ("Bacardi"), which is headquartered in, and organized under the laws of, Bermuda.  *Id.* ¶¶ 9-10.  SC and Empire are each 50% members of D'Usse, with equal economic interests in the Company, and each serves on D'Usse's two-member board of directors.  *Id.* ¶¶ 6-7.  Furthermore, SC and Empire are both parties to the D'Usse limited liability company agreement (the "Operating Agreement"), which sets forth certain of their rights and responsibilities in connection with D'Usse.  *Id.* ¶ 6.

D'Usse exclusively owns the brand intellectual property that is the heart and soul of its business and value proposition.  *Id.* ¶ 13.  Empire serves as D'Usse's "Executive Director," with "the full right, power and authority to manage the business and affairs of the Company on a day-to-day basis, to make (or cause to be made) all decisions relating thereto and to take (or cause to be taken) all actions relating thereto," subject to certain actions requiring board approval and decisions reserved for SC.  *Id.* ¶ 11.  Under a 2012 agreement, D'Usse contracts out operational services and manufacturing for a fee to Empire's corporate affiliate, Bacardi International, but such services could be provided by other spirits companies.  *Id.* ¶¶ 16-17.  D'Usse does not have any employees of its own; instead, every person acting on behalf of D'Usse is an employee of SC, Bacardi, or their corporate affiliates.  *Id.* ¶ 14.

As relevant here, the Operating Agreement (i) grants Empire a "call option" empowering Empire to compel the sale of SC's interest in D'Usse to Empire and, conversely, (ii) grants SC a "put option" allowing SC to compel Empire to buy SC's interest in D'Usse.  *Id.* ¶ 22.  Both the call and put options are subject to a contractually specified valuation process,[1] under which SC and Empire are to "negotiate in good faith and use commercially reasonable efforts to agree upon a mutually acceptable price and terms" for one party's purchase of the other party's interests in the Company.  *Id.* ¶ 23.  Only in the event that the parties' good-faith and commercially reasonable negotiations do not result in a mutually agreeable price, the Operating Agreement provides for further processes to determine the price at which the options will be valued.  *Id.* ¶ 25.

## II.    After SC Exercises Its Put Option, Bacardi Procures a Breach of D'Usse's Operating Agreement by Manipulating Valuation Negotiations.

In light of D'Usse's success, expectations of future growth based on burgeoning demand, and an agreement by SC and Empire to target annual sales of two million cases of Cognac by 2026—and against the backdrop of Bacardi's stranglehold over the Company's management—SC exercised its put option on October 15, 2021.  *Id.* ¶¶ 26-31.  Empire did not engage in good-faith, commercially reasonable efforts to align on a mutually acceptable price and terms for the sale of SC's 50% ownership stake in D'Usse, as required under the Operating Agreement.  Instead, flouting its duties under the Operating Agreement, Empire embarked on a campaign of stalling and stonewalling, depriving SC of necessary information concerning D'Usse's business and affairs, taking unreasonable negotiation positions, and intentionally disrupting and harming D'Usse's business in order to set the stage for acquiring SC's interest in D'Usse on the cheap.  *Id.* ¶¶ 34-48.  Empire's misconduct in that regard, directed by Bacardi, continues to the present day.

---

[1] That valuation process is the subject of an ongoing confidential arbitration between Empire and SC.  In addition, SC recently moved to vacate in part or modify a partial award issued in that arbitration.  *See In re SCLiquor, LLC*, No. 653680/2022 (Sup. Ct. N.Y. Cnty.).

Indeed, despite the Operating Agreement's imposition of a 60-day negotiation window once SC exercised its put option, Empire's initial reaction was to sandbag such negotiations by refusing to provide necessary information for, or even engage in discussions concerning, the valuation process. *Id.* ¶ 34. No substantive discussions took place until on or about December 1, 2021, almost seven weeks after the put option had been exercised on October 15, 2021. *Id.* By that time, the lion's share of the contractually mandated negotiation window had already lapsed without ***any*** negotiations having taken place.

Although the contractual put option required Empire to buy SC's entire 50% stake in D'Usse, around December 10, 2021, Empire offered to buy just half of SC's interest (*i.e.*, 25% of D'Usse) for an amount in the range of $460 million to $510 million—implying that Empire valued SC's entire 50% interest in D'Usse at approximately $1 billion. *Id.* ¶ 36. SC declined. *Id.*

Instead, on or about December 21, 2021, SC offered to buy Empire's 50% interest in D'Usse for $1.5 billion in cash, a 50% ***premium*** to the valuation implied by Empire's December 10 offer. SC's offer indicated a full enterprise valuation for D'Usse of approximately $3 billion, but, without explanation, Empire rejected what was—in Empire's estimation, had its earlier offer been genuine—a premium price for its share of the D'Usse business. *Id.* ¶ 37.

During these December 2021 negotiations, Empire and SC agreed to extend the Operating Agreement's 60-day negotiating window until December 31, 2021. *Id.* ¶ 34. On that date, SC and Empire exchanged proposed valuations for SC's 50% membership interest in D'Usse. *Id.* ¶ 38. Based on the Company's performance to-date, the brand's projected performance going forward, advice from a renowned investment banking advisory firm, and Empire's refusal to accept a $1.5 billion price tag for its own 50% interest in D'Usse, SC reasonably valued its 50% membership interest at $2.5 billion. *Id.* ¶ 39. In a head-spinning turn of events, Empire now claimed that SC's

*50%* ownership interest in D'Usse was worth only $460 million—*despite having offered $460 million or more for just a 25% interest mere weeks earlier*. *Id.* ¶ 40. That bad-faith offer also sharply contradicted Empire's refusal to accept $1.5 billion—three times as much—for its own *50%* interest. Empire's seesaw conduct revealed that it did not actually believe its purported valuation during the contractual negotiation period was anywhere close to the mark.

Empire's purported valuation was at least partly based on the adoption of unfounded, pessimistic assumptions that were contrary to the parties' prior agreements and expectations, and that could only have been imposed top-down through the influence of Bacardi, based on its obvious incentive to drive down the price its subsidiary had to pay for SC's piece of the business. That much is clear from the parties' dealings earlier in 2021. In July 2021 (*i.e.*, shortly before SC exercised its put option in October), Empire presented to SC a model indicating that D'Usse could sell two million cases of Cognac annually by 2026, confirmed that D'Usse would use that figure for planning purposes and attempt to hit that target, and committed to seeking Bacardi's approval for expenses to support that volume projection. *Id.* ¶¶ 29-30. Also in July 2021, Mr. Vergara, the person through whom Empire performed its duties with respect to D'Usse, confirmed to Bacardi's board of directors that he "believe[d] this vision [was] realistic and achievable" given the health of the D'Usse brand and the opportunities available to the company. *Id.* ¶ 30.

After SC exercised its put option, however, Empire suddenly changed its tune. Empire concocted a valuation that relied on far more pessimistic assumptions about D'Usse's future performance that dated back to April 2021, notwithstanding that SC and Empire had already rejected such assumptions as unreliable months earlier. *Id.* ¶¶ 41-42. None of Empire's *post hoc* rationalizations for its about-face stood up to scrutiny. For example, during the December 2021 valuation negotiations Empire insisted that D'Usse's historic sales had benefited from a one-time

"COVID bump" and that, in any event, Bacardi could not procure the materials required to make enough D'Usse Cognac to meet market demand. *Id.* ¶ 42. But those same concerns had surfaced in the April 2021 modelling and Empire had repeatedly disavowed them in the ensuing months, predicting that D'Usse would significantly outperform those overly pessimistic scenarios. *Id*. The only reasonable explanation for Empire's sudden reversal is that it was being directed by its corporate parent to dramatically undervalue SC's interest in D'Usse.

During the parties' negotiations, Empire also took the odd position that SC's 50% membership interest should be valued as of some unspecified date in the future, close to when SC's interests would actually transfer to Empire. *Id.* ¶ 44. Not coincidentally, around the same time, Empire suddenly began relaying bad news about the brand's performance to SC—claiming not only that D'Usse had recently started to underperform against its annual operating plan, but also that sales numbers Empire had previously reported to SC for November and December were inaccurate because D'Usse's sales were in fact far worse. *Id.* ¶ 45. The timing of this late-breaking bad news about D'Usse's performance, following SC's decision to sell its stake in the business, is suspect to say the least. It is, at minimum, a reasonable inference that Empire used its functional control over D'Usse's information and day-to-day operations to temporarily and artificially reduce D'Usse's value in order to purchase it on the cheap.

And Empire cannot have been acting alone. During the contractually mandated negotiation window, Empire principally acted through (i) Mauricio Vergara, a long-time executive of Bacardi who reported directly to members of Bacardi's board of directors concerning D'Usse business, and (ii) Scott Roades, Bacardi's Vice President for Corporate Development, who historically had played no role in acting on behalf of Empire but abruptly inserted himself into valuation negotiations once SC exercised the put option. *Id.* ¶¶ 12, 55-56. Based on SC's interactions with

Mr. Vergara and Mr. Roades, SC has reasonably concluded that both individuals were doing the bidding of Bacardi when—as described above—they went back on earlier agreements about sales projections, engineered a lowball offer for SC's stake in the brand despite having offered double that amount weeks earlier (and getting a far higher offer from SC), and manipulated sales performance following SC's put exercise. *Id.* ¶¶ 52-61. That conclusion is further supported by the Operating Agreement itself, which expressly provides that Empire is "wholly-owned ***and controlled***" by Bacardi. *Id.* ¶ 9. Empire's conduct amounts to bad-faith, unreasonable negotiation efforts in violation of the Operating Agreement. *Id.* ¶ 33.

### III.  SC Seeks Discovery in Aid of Reasonably Contemplated Foreign Litigation Against Bacardi.

But for Bacardi's procuring Empire's breach of the Operating Agreement, Empire would likely have been required to close on its purchase of SC's 50% membership interest in D'Usse nearly one year ago at a price materially exceeding its purported $460 million valuation. Counsel's research, as developed in the supporting declaration of a leading Bermudian law expert, Rod Attride-Stirling, indicates that a cause of action premised on the aforementioned course of conduct is available to SC in Bermuda. *See generally* Attride-Stirling Decl. Accordingly, SC has retained Bermudian counsel and is now preparing to bring suit against Bacardi in Bermuda for procuring Empire's breach of the Operating Agreement. Perez Decl. ¶¶ 62-63.

The discovery SC seeks here in aid of the forthcoming Bermuda Action is reflected in the subpoena attached to the Declaration of Reed Brodsky submitted in support of this application. The respondents are financial institutions who have loaned money to Bacardi and/or its affiliates, *see* Brodsky Decl. ¶¶ 12-18, and to whom Bacardi and/or its affiliates have been required to make

certain financial disclosures.[2]   SC seeks the production of documents in such institutions'

possession, custody or control concerning Bacardi and/or its affiliates' statements concerning or

relating to the valuation of SC's 50% interest in D'Usse.

This discovery is targeted to help SC pursue its claims in Bermuda to recoup the many

millions of dollars in damages caused by Bacardi's wrongful acts.  Although the documents sought

herein likely will be highly relevant to the Bermuda Action, most if not all of these materials are

likely to be beyond the jurisdiction of Bermudian courts.  *See* Attride-Stirling Decl. ¶ 37.  Those

materials that are with the jurisdiction of the Bermudian courts may well not be obtainable in

Bermuda in any event, given the more limited discovery procedures available in the Bermudian

courts.  *See id.* ¶¶ 27-48.  Nevertheless, Bermuda law expert Rod Attride-Stirling opines that the

Bermuda courts likely would not hesitate to receive and consider evidence obtained pursuant to

the procedures in aid of foreign litigation that 28 U.S.C. § 1782 authorizes.  *See id.* ¶¶ 49-65.  SC

therefore intends to bring legal action in Bermuda promptly after receipt of the discovery sought

through this and other Section 1782 proceedings.  Perez Decl. ¶ 62.

## LEGAL STANDARD

Section 1782 provides that a federal district court "may" order discovery "for use in a

proceeding in a foreign or international tribunal" from any person or entity within that court's

jurisdiction. 28 U.S.C. § 1782(a).  This statute authorizes a "broad range of discovery," *Intel Corp.*

*v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 259 (2004), in order "to liberalize the assistance

given to foreign and international tribunals," *In re Del Valle Ruiz*, 342 F. Supp. 3d 448, 453

(S.D.N.Y. 2018) (quoting Hans Smit, *American Assistance to Litigation in Foreign and*

---

[2] Specifically, the respondents are (1) Equitable Holdings, Inc.; (2) Gerber Life Insurance Company; (3) The Guardian Life Insurance Company of America; (4) The Hartford Financial Services Group, Inc.; (5) Renaissance Reinsurance U.S., Inc.; and (6) SBLI USA Life Insurance Company, Inc.

*International Tribunals*, 25 Syracuse J. Int'l L. & Com. 1, 9 (1998)), *aff'd*, 939 F.3d 520 (2d Cir. 2019).  Where the information sought is relevant, it is "presumptively discoverable under § 1782." *In re Bayer AG*, 146 F.3d 188, 196 (3d Cir. 1998).  "Consistent with the statute's modest *prima facie* elements and Congress's goal of providing equitable and efficacious discovery procedures, district courts should treat relevant discovery materials sought pursuant to § 1782 as discoverable unless the party opposing the application can demonstrate facts sufficient to justify the denial of the application." *Id.* at 195.  As a result, Section 1782 "has, over the years, been given 'increasingly broad applicability.'"  *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012) (quoting *In re Gianoli Aldunate*, 3 F.3d 54, 57 (2d Cir. 1993)); *see also In re Sarrio S.A.*, 173 F.R.D. 190, 193 (S.D. Tex. 1995) ("The history of section 1782 indicates that Congress intended federal courts to provide broad assistance to foreign litigants who request permission to conduct discovery in the United States.").

There are three statutory requirements for the Court to allow discovery.  *In re Edelman*, 295 F.3d 171, 175-76 (2d Cir. 2002).  *First*, the person from whom discovery is sought must "reside[]" or be "found" in the district.  28 U.S.C. § 1782(a).  *Second*, the discovery must be "for use in a proceeding in a foreign or international tribunal."  *Id.*  That proceeding "must be in reasonable contemplation," but it "need not be 'pending' or 'imminent.'"  *Intel*, 542 U.S. at 247. *Third*, there must be an "application" from "any interested person" in that contemplated proceeding.  28 U.S.C. § 1782(a).

When all three requirements are met, the decision to grant discovery rests with the district court's discretion, the exercise of which is to be guided by four factors articulated in the Supreme Court's seminal *Intel* decision.  Specifically, in considering whether to grant the requested discovery, district courts consider: (i) whether the person from whom discovery is requested is a

party to the foreign proceeding; (ii) the nature of the foreign tribunal, the character of the foreign proceeding, and the tribunal's receptivity to the federal court's assistance; (iii) whether the applicant is attempting to circumvent discovery restrictions or policies of the foreign tribunal; and (iv) whether the discovery sought is unduly intrusive or burdensome.  *Intel*, 542 U.S. at 264-65.

## ARGUMENT

SC's application satisfies all of Section 1782's statutory requirements and the Supreme Court's discretionary factors all weigh heavily in favor of granting the requested discovery. Indeed, two courts have already expressly held as much in connection with substantially similar Section 1782 applications previously filed by SC in connection with the Bermuda Action. Specifically, on November 22, 2022, the Honorable Nina Morrison found that "(1) the statutory requirements of 28 U.S.C. § 1782 are satisfied, and (2) the factors identified by the U.S. Supreme Court in *Intel* . . . weigh in favor of granting" SC's application for discovery from a spirits distributor in the Eastern District of New York.  *In re SCLiquor, LLC*, No. 22 Misc. 3325, ECF Entry (E.D.N.Y. Nov. 22, 2022).  Similarly, the Honorable Barbara Moses found that "the statutory requirements of 28 U.S.C. § 1782 have been met" by SC's earlier application to this Court, including because the discovery sought was "for use in a proceeding before a foreign tribunal, specifically, an action against Bacardi Ltd. (Bacardi) in the civil courts of Bermuda, which action has not yet been commenced but is in 'reasonable contemplation,'" and that "the balance of the discretionary factors set forth in *Intel* . . . weigh in favor of permitting the discovery requested" by SC in connection with discovery sought from another financial institution in this district.  *In re*

*SCLiquor, LLC*, No. 22 Misc. 350, Dkt. No. 21 (S.D.N.Y. Dec. 22, 2022) (quoting *Intel*, 542 U.S. at 247).  The same result should obtain here and this Court should grant SC's application in full.[3]

## I.     SC's Application Satisfies the Statutory Requirements for Granting Discovery Pursuant to 28 U.S.C. § 1782.

The discovery sought in this Application readily meets the *prima facie* statutory requirements set forth in Section 1782.  Each of those requirements is addressed in turn below.

### A.     SC seeks discovery from parties "resid[ing]" or "found" in this district.

The first statutory requirement of Section 1782 is that the discovery targets must "reside[]" or be "found" within the Southern District of New York.  28 U.S.C. § 1782(a).  At minimum, under the requisite "flexible reading" of the statutory language, whether a company "resides or is found" in this district can be established through their physical presence and service within the district.  *In re Edelman*, 295 F.3d at 179-80.  Similarly, a party that maintains an office and does business in New York is also found in this district.  *See, e.g.*, *In re Mariani*, No. 20 Misc. 152, 2020 WL 1887855, at *1 (S.D.N.Y. Apr. 16, 2020); *In re Operacion y Supervision de Hoteles, S.A. de C.V.*, No. 14 Misc. 82, 2015 WL 82007, at *5 (S.D.N.Y. Jan. 6, 2015); *In re Bank of Cyprus Pub. Co. Ltd.*, No. 10 Misc. 23, 2011 WL 223168, at *2 (S.D.N.Y. Jan. 21, 2011).  More broadly, the Second Circuit has made clear "that § 1782's 'resides or is found' language extends to the limits of personal jurisdiction consistent with due process," *In re Del Valle Ruiz*, 939 F.3d at 528.

Each of the respondents is found within this district because it maintains and operates a corporate office here.  *See* Brodsky Decl. ¶¶ 6-11.

---

[3] SC has since determined that the respondent to its earlier Southern District of New York application does not have the information sought by SC.  Pursuant to discussions between SC and that respondent, the parties to that earlier action therefore consider that matter fully resolved.  In addition to the two Section 1782 applications discussed above, SC has also applied for discovery from various Bacardi affiliates and employees in the Southern District of Florida.  Those Bacardi affiliates and employees have opposed SC's Florida application, which remains *sub judice*.  *See In re SCLiquor, LLC*, No. 22 Misc. 23737 (S.D. Fla.).

**B.    The discovery sought is "for use" in a "reasonably contemplated" proceeding in Bermuda.**

The discovery sought by SC is for use before a foreign tribunal, specifically, for SC's contemplated Bermuda Action in the civil courts of Bermuda against Bacardi.    A foreign proceeding for which a court may authorize discovery under Section 1782 need not be actually pending or even "imminent;" rather, it need merely be "within reasonable contemplation."  *Intel*, 542 U.S. at 259.  Because an applicant "must have more than a subjective intent to undertake some legal action," determining whether a proceeding is in "reasonable contemplation" turns on whether the applicant has provided "some objective indicium that the action is being contemplated," *In re Hansainvest Hanseatische Investment-GmbH*, 364 F. Supp. 3d 243, 249 (S.D.N.Y. 2018) (cleaned up), such as "sworn statements attesting to petitioners' intent to litigate and describing the legal theories on which they plan to rely" in the foreign proceeding, *In re Top Matrix Holdings Ltd.*, No. 18 Misc. 465, 2020 WL 248716, at *5 (S.D.N.Y. Jan. 16, 2020) (citing *In re Hornbeam Corp.*, 722 F. App'x 7, 9-10 (2d Cir. 2018)).

Under this permissive standard, federal courts in this Circuit grant Section 1782 applications where an applicant reasonably contemplates initiation of a lawsuit but seeks to gather additional evidence before filing suit.  *See, e.g.*, *In re Hansainvest Hanseatische*, 364 F. Supp. 3d at 250 (granting Section 1782 application where "the contours of the potential litigation are already well-defined" and applicant affirmatively stated its intent to file foreign action); *In re Wilhelm*, 470 F. Supp. 2d 409, 411 (S.D.N.Y. 2007) (granting Section 1782 application to aid an insider trading investigation where "a 'formal accusation[]' against the individuals in question lies within 'reasonable contemplation'").

Where, as here, a Section 1782 application is made prior to commencement of a foreign action, assessing whether foreign litigation is "reasonably contemplated is done without

considering "whether any . . . underlying dispute . . . has merit" because United States courts "have no occasion to address" the parties' foreign-law claims, "which will likely be resolved in various tribunals" abroad. *Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262, 1268 (11th Cir. 2014); *see also*, *e.g.*, *In re Zouzar Bouka*, No. 22 Misc. 92, 2022 WL 15527657, at *4 (S.D.N.Y. Oct. 28, 2022) ("A district court's focus in considering a request under § 1782 is not on the merits of the proposed claim, but on the movant's practical ability to inject the requested information into a foreign proceeding." (internal quotations, corrections and citation omitted)); *In re England/Bahamas*, No. 20 Misc. 61696, 2021 WL 3270074, at *5 (S.D. Fla. July 30, 2021) (granting Section 1782 application "without determining the merits of the contemplated claim (which is best left to the foreign court)").

Furthermore, the discovery sought need not be necessary to "commence such a proceeding" or to plead the plaintiff's claim. *Mees v. Buiter*, 793 F.3d 291, 294, 296, 299 (2d Cir. 2015) (vacating denial of Section 1782 application where applicant sought "a range of materials that would corroborate [her] claims" to aid in "plead[ing] and prov[ing] a contemplated defamation suit" abroad). Moreover, because "there is no statutory basis for any admissibility requirement," discovery is permitted under Section 1782 even if the evidence is not ultimately admissible in a foreign proceeding. *Brandi-Dohrn*, 673 F.3d at 82. Rather, to qualify as being "for use" in a foreign proceeding, the discovery sought need only concern information that can "be employed with some advantage or serve some use in the proceeding." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 132 (2d Cir. 2017). Accordingly, the pertinent inquiry focuses "on the ***practical ability*** of an applicant to place a beneficial document—***or the information it contains***—before a foreign tribunal." *Id.* at 131 (second emphasis added).

Under those standards, SC plainly has met its *prima facie* burden of demonstrating that the evidence sought is for use in a foreign proceeding that is reasonably contemplated.  As described more fully in the Statement of Facts, *supra* pp. 4-7, Bacardi's subsidiary Empire unreasonably delayed for weeks before engaging in contractually mandated sale-price negotiations with SC, after which Empire's valuation unjustifiably relied on irrational, pessimistic assumptions about the Cognac business that Empire had previously disavowed in favor of the expectation that D'Usse would continue its growth and sell two million cases annually by 2026.  The requisite good-faith negotiations were further undermined by Empire's concurrent attempts to engineer a temporary dent in D'Usse's performance so that it could manufacture the false narrative that D'Usse sales were slipping in the fourth quarter of 2021 (conveniently after SC had exercised its right to exit the venture).  Indeed, any suggestion that Empire was acting in good faith during this period—as it was contractually obligated to do—is belied by the parties' negotiation history.  If Empire genuinely believed that its December 31, 2021 valuation of SC's whole 50% interest reflected the true value of the D'Usse brand, Empire would not have offered weeks earlier to buy just half  of SC's stake in D'Usse (*i.e.*, 25%) for the virtually identical price.  In fact, if Empire genuinely believed that its December 31, 2021 valuation of $460 million reflected half of the enterprise value of the D'Usse brand, then Empire should have jumped to accept more than three times that amount to sell its own half to SC when SC offered it $1.5 billion.  Empire's wildly oscillating conduct makes clear that it recognized a 50% interest in D'Usse was worth far more than the $460 million that it claimed, yet Empire was compelled to put forward a valuation it knew to be unreasonable.

*Cf. SIGA Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108 (Del. 2015) (affirming $113 million expectation damages award for defendant's breach of obligation to negotiate in good faith).[4]

Moreover, given that Empire is controlled by Bacardi executives and employees, only improper influence from its parent company, Bacardi, can explain Empire's decision to suddenly jettison its previously stated confidence in the D'Usse brand's prospects, thereby breaching its contractual obligation to "negotiate in good faith and use commercially reasonable efforts to agree upon a mutually acceptable price and terms for the Put Option." Brodsky Decl., Ex. 1 (Op. Agmt.) § 8.1. Accordingly, SC seeks (including through related actions) evidence to support SC's reasonably contemplated claim in Bermuda that Bacardi improperly procured Empire's violation of its duty to negotiate in good faith and to use commercially reasonable efforts to agree to a price and terms for SC's interest in D'Usse. As set forth in the accompanying declaration of Bermudian law expert Rod Attride-Stirling, that is a colorable claim under Bermudian law. The claim requires demonstrating that the Operating Agreement is a binding contract between SC and Empire that Bacardi knew of, Empire breached that contract, Bacardi intended to and did wrongfully procure Empire's breach of the Operating Agreement, and SC suffered damages as a result. *See generally* Attride-Stirling Decl. ¶¶ 14-26. All of those elements are plausibly and adequately alleged in the factual narrative herein.

**C.     SC is an "interested person."**

The Supreme Court has made clear that prospective "litigants are included among, and may be the most common example of, the 'interested persons' who may invoke § 1782." *Intel*, 542 U.S. at 256 (alterations omitted). Accordingly, as a prospective plaintiff in a contemplated

---

[4] The Operating Agreement is governed by Delaware law, Brodsky Decl., Ex. 1 (Op. Agmt.) § 12.9, but the pertinent analysis for purposes of Section 1782 must focus on the contemplated Bermuda Action, which will allege a cause of action for procuring a breach of the Operating Agreement that will be governed by Bermudian law.

Bermuda action alleging harm caused to it by Bacardi's actions,  SC is undisputedly an "interested person" as that phrase is used in § 1782.  *See In re Zouzar Bouka*, 2022 WL 15527657, at *3 (finding Section 1782 applicant's status as "would-be plaintiff in [a] contemplated French action" was sufficient to satisfy the "interested person" requirement).

## II.     The Discretionary Factors Weigh in Favor of SC's Application.

As previously recognized by Judges Moses and Morrison, the four discretionary factors identified by the Supreme Court in *Intel* also support granting the discovery sought in this application.  *See In re SCLiquor, LLC*, No. 22 Misc. 3325, ECF Entry (E.D.N.Y. Nov. 22, 2022)*; In re SCLiquor, LLC*, No. 22 Misc. 350, Dkt. No. 21 (S.D.N.Y. Dec. 22, 2022).

### A.     The discovery targets will not be participants in the Bermuda Action.

The first *Intel* factor clearly weighs in favor of awarding discovery here because none of the discovery targets will be participants in SC's contemplated Bermuda Action against Bacardi. Section 1782 discovery "is more likely to be justified when the person from whom discovery is sought is not a participant in the prospective foreign proceeding because nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach."  *In re Bracha Found.*, 663 F. App'x 755, 764-65 (11th Cir. 2016) (citation and quotation marks omitted).  The focus of the inquiry is on "the person from whom discovery is sought," *Intel*, 542 U.S. at 264, not on whether the same evidence might also be available from other sources.

Here, the respondents are not contemplated to be parties to the Bermuda Action.  Indeed, as United States juridical entities, they may not even be subject to jurisdiction in Bermuda.  *See* Attride-Stirling Decl. ¶ 37.  Accordingly, this is not a situation where the "foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence." *Intel*, 542 U.S. at 264.

16

Nor does that analysis change if Bacardi has access to some of the same documents or information sought here. Shared access does not negate a respondent's obligations pursuant to a Section 1782 subpoena. Indeed, the Second Circuit has expressly rejected arguments that Section 1782 discovery is inappropriate where a party to a foreign proceeding may also have the ability to produce the requested discovery because there is no "requirement that an applicant must first seek discovery abroad before bringing a § 1782 petition." *In re Catalyst Managerial Servs., DMCC*, 680 F. App'x 37, 41 (2d Cir. 2017). Accordingly, it is appropriate to seek discovery in the United States from entities found within the United States pursuant to Section 1782 even if some of the same documents and information sought also "are accessible" to a party in the contemplated foreign proceeding. *Id.*

**B.      Bermuda is receptive to foreign evidence.**

To deny Section 1782 discovery, "courts look for authoritative proof that a foreign tribunal would reject evidence obtained with the aid of § 1782." *In re Kreke Immobilien KG*, No. 13 Misc. 110, 2013 WL 5966916 (S.D.N.Y. Nov. 8, 2013). Absent a "clear directive," such as "a forum country's judicial, executive or legislative declarations that specifically address the use of evidence gathered under foreign procedures," analysis of a foreign jurisdiction's receptivity to judicial assistance from the United States should be "informed by section 1782's overarching interest in providing equitable and efficacious procedures for the benefit of tribunals and litigants involved in litigation with international aspects." *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995) (citation and quotation marks omitted).

To avoid "speculative forays into legal territories unfamiliar to federal judges," which would be "a costly, time-consuming, and inherently unreliable method of deciding section 1782 requests," courts "consider only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782." *Id.* at 1099-1100; *see also*, *e.g.*, *In re Bayer*, 146 F.3d at

196 (discussing lack of "evidence from which the district court might have reasonably concluded that presentation of the material sought . . . would offend [a] Spanish court"). Absent such proof, district courts routinely defer to their foreign counterparts to "decide whether the [requested] evidence is admissible," recognizing that they "will be in a better position to do so if [applicants are] permitted to conduct the requested discovery first" because denying discovery would deprive a party "of any opportunity even to try to offer the evidence." *In re Grupo Qumma, S.A. de C.V.*, No. 05 Misc. 85, 2005 WL 937486, at *3 (S.D.N.Y. Apr. 22, 2005). Moreover, "the weight of authority" requires that a party opposing a Section 1782 application "bears the burden of proving the non-receptivity of the foreign tribunal." *In re Gorsoan Ltd.*, No. 13 Misc. 397, 2014 WL 7232262, at *7 (S.D.N.Y. Dec. 10, 2014), *aff'd sub nom*, *Gorsoan Ltd. v. Bullock*, 652 F. App'x 7 (2d Cir. 2016). Here, there is no such authoritative proof nor a clear directive disallowing foreign discovery in Bermuda.

To the contrary, Bermudian courts are plainly receptive to discovery material collected abroad. *See* Attride-Stirling Decl. ¶¶ 49-65. In *Hiscox Services Ltd. v. Abraham*, for instance, the Supreme Court of Bermuda recently granted summary judgment in favor of plaintiffs in express reliance on materials that were produced in connection with plaintiffs' "Petition, under section 1782 of the United States Code, in the United States District Court, Southern District of New York." [2018] Bda LR 88. In that dispute, plaintiffs' Section 1782 petition seeking discovery for use in Bermudian proceedings was promptly granted one week after its *ex parte* submission. *See In re Hiscox Servs., Ltd.*, 18 Misc. 00226, Dkt. No. 10 (S.D.N.Y. June 6, 2018). Moreover, Bermudian authorities have themselves invoked Section 1782 in order to obtain evidence located in the United States for use in Bermudian proceedings. *See Young v. Chemical Bank, N.A.*, No. 87 Civ. 8601, 1988 WL 130929, at *1-2 (S.D.N.Y. Dec. 1, 1988) (reciting procedural history and

dismissing claims against Chemical Bank for providing discovery materials to the Bermuda Attorney General pursuant to Section 1782). "Because [Bermuda] has availed itself of this discovery tool, it can hardly be said that its own courts would be unreceptive to such discovery." *In re Chevron Corp.*, No. 11 Civ. 24599, 2012 WL 3636925, at *11 (S.D. Fla. June 12, 2012). Accordingly, the second *Intel* factor is satisfied.

**C.    SC is not attempting to circumvent Bermudian proof-gathering restrictions.**

The third *Intel* factor is similarly met because, as in other Section 1782 applications involving Bermudian proceedings, the discovery sought here does not at all attempt to circumvent Bermuda's proof-gathering restrictions.  Section 1782 does not require that the information sought be discoverable under the procedures of the foreign tribunal.  To the contrary, "nothing in the text of § 1782 limits a district court's production-order authority to materials that could be discovered in the foreign jurisdiction if the materials were located there." *Intel*, 542 U.S. at 260.  Rather, in determining whether an application amounts to an effort to circumvent foreign proof-gathering restrictions, courts consider whether the discovery is being sought in bad faith.  *Minatec Fin. S.A.R.L. v. SI Grp., Inc.*, No. 08 Civ. 269, 2008 WL 3884374, at *8 (N.D.N.Y. Aug. 18, 2008). Absent a "clear indication" of bad faith, "the third *Intel* discretionary factor . . . favors authorizing the requested discovery." *In re Tovmasyan*, 557 F. Supp. 3d 348, 358 (D.P.R. 2021).

Here, SC's request for discovery in this application is a reasonably tailored effort to obtain probative evidence for use in its contemplated Bermuda Action to recover millions of dollars as damages caused by Bacardi's tortious conduct.  The discovery aims to procure evidence of Empire's efforts, as day-to-day manager of D'Usse, to suppress the brand's value for purpose of the put negotiations, which SC reasonably believes was directed by Bacardi.  This evidence will be used to support SC's pleadings and claims that Bacardi violated Bermudian law by wrongfully procuring Empire's breach of its contractual obligation to negotiate the price and terms for

Empire's purchase of SC's 50% membership interest in D'Usse in good faith and using commercially reasonable efforts.  None of this discovery would affirmatively circumvent any Bermudian proof-gathering restrictions.  *Accord* Attride-Stirling Decl. ¶¶ 49-65.  This factor, too, weighs in favor of granting relief.

> ### D.      The discovery sought is not unduly intrusive or burdensome.

The discovery SC seeks is both relevant and not overly burdensome.  Discovery under Section 1782 may be as broad and liberal as that allowed under the Federal Rules of Civil Procedure.  *See Intel*, 542 U.S. at 260; *Mees*, 793 F.3d at 302.  Here, SC seeks evidence from Bacardi investors concerning financial disclosures and/or statements that Bacardi and/or its affiliates made reflecting the value of SC's ownership interest in D'Usse, LLC.  Among other things, since the respondents held notes issued by Bacardi and/or its affiliates during the relevant time period, Bacardi and/or its affiliates would have been required to make certain disclosures to them pursuant to Securities laws of the United States and the terms of their agreements with Bacardi and/or its affiliates.  These financial disclosures likely would have included Bacardi and/or its affiliates' statements regarding material events such as SC's exercise of its put option pursuant to the D'Usse Operating Agreement, SC's $1.5 billion offer to purchase Empire's ownership interest in D'Usse, and the arbitration disputes between SC and Empire.  These financial disclosures also likely include information about how Bacardi and/or its affiliates valued SC's 50% ownership interest, likely state that SC continues to hold a 50% interest in D'Usse unless and until the put transaction is closed, and describe and/or state the amount of funds needed to meet projected annual sales of D'Usse Cognac Beverage Products through at least in or about 2026. This discovery is critical to the allegations that will underpin SC's Bermudian lawsuit.  And none of it—including document discovery of corporate records that financial institutions regularly turn

over in litigation—is unduly burdensome in the context of this dispute concerning a put option for

ownership of a multi-billion dollar business.[5]

*   *   *

In sum, each of the *Intel* factors weighs in favor of granting SC the documents sought in

this application.  The application should be granted in full.

## CONCLUSION

For the foregoing reasons, Applicant SCLiquor, LLC respectfully requests that the Court

grant this Application in its entirety.


Dated:   New York, New York
   January 4, 2023

        By:  /s/ Reed Brodsky
        Reed Brodsky
        Rahim Moloo
        Gabriel Herrmann
        Amer S. Ahmed
        Michael Nadler
        Zachary Kady
        David Salant
        GIBSON, DUNN & CRUTCHER LLP
        200 Park Avenue
        New York, NY  10166-0193
        rbrodsky@gibsondunn.com
        rmoloo@gibsondunn.com
        gherrmann@gibsondunn.com
        aahmed@gibsondunn.com
        mnadler@gibsondunn.com
        zkady@gibsondunn.com
        dsalant@gibsondunn.com
        Telephone:  212.351.4000
        Facsimile:  212.351.4035

        *Attorneys for Applicant SCLiquor, LLC*

---

[5] To the extent that there is overlap among the information provided to these financial institutions by Bacardi and/or its affiliates, SC will work with the respondents to avoid unnecessarily duplicative document productions to further minimize the burden imposed by the discovery sought.